UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TESSERA, INC., <br><br> Plaintiff, <br><br> v. <br><br> SONY CORPORATION, <br><br> Defendant. | Case No. 5:11-CV-04399-EJD (HRL) <br><br> [REDACTED] DISCOVERY DISPUTE JOINT REPORT #4 SUPPLEMENT <br><br> Judge: Howard R. Lloyd |

Pursuant to the Court's October 1, 2012 Order On DDJRs 1-4, And Motion To Strike ("Order"), Tessera, Inc. ("Tessera") and Sony Corp. ("Sony") hereby submit this Discovery Dispute Joint Report #4 Supplement.

**Tessera's Position**

[redacted]

1 Master License Agreement, ¶¶ III & IV. Sony did none of the foregoing.

2 ▮

3 ▮

4 ▮

5 ▮

6 Accordingly, for its damages case, Tessera needs to know which packages meet the criteria

7 above, how many of them were ▮ and how many Billable Pins

8 each package contains. Because Sony has predominantly incorporated the packages at issue into

9 its end products, such as televisions, determining the number of pertinent packages ▮

10 ▮ by Sony requires information regarding which end products contain

11 the packages at issue, how many of those packages each such end product contains (*e.g.*, a single

12 television could include two or more of the same package), and the quantity of each such end

13 product ▮ by Sony.[1]

14 Tessera has narrowed its Second Set of Requests for Production and Second Set of

15 Interrogatories to seek the minimum set of information it requires to calculate damages, and no

16 more. Tessera did so using the language of the pertinent provisions of the agreement, discussed

17 above, nearly verbatim in tailoring its narrowed definitions and requests as set forth below:

18 Narrowed Definitions

19 "Package At Issue" means a ball grid array package or land grid array package:

20     1. in which, for face-down packages, the package substrate terminal pitch is 1mm or less and at least one package substrate terminal is located directly beneath the IC;

21

22     2. in which, for face-up packages, the package substrate terminal pitch is 1mm or less and at least one package substrate terminal is located directly beneath the IC and the package substrate is unreinforced or the package substrate is reinforced where the thickness of the reinforced substrate is 0.36mm or less; or

23

24     3. for which Sony has not determined whether item 1 or 2 are met.[2]

---

25 [1] During the parties' meet and confer, Tessera asked whether Sony kept information about package quantities separately from end product sales volume, such that there might be a more streamlined
26 way to provide the information required. Sony declined to respond.

27 [2] This element is necessary to ensure that Sony does not seek to evade its royalty obligations by purporting not to know what it is selling. Sony can and should ascertain which packages meet the
28 definition in the agreement. If Sony is unwilling to do that, then at a minimum it needs to provide Tessera with the information necessary for Tessera to make that determination.

"Product At Issue" means any product or good that was made, sold, transferred or used internally by Sony between October 15, 1997 and September 24, 2010,[3] and which contains at least one Package At Issue.

"Billable Pin" means any electrical connection to an IC bond pad made or contained within a package.

<u>Sony shall produce documents sufficient to:</u>

(a) identify, and determine the quantity of, each Product At Issue;

(b) identify, and determine the quantity of, each Package At Issue that is contained within each Product At Issue;

(c) determine the manufacturer of each Package At Issue;

(d) determine the number of Billable Pins in each Package At Issue; and

(e) determine whether each Package At Issue meets item 1 or 2 in the definition of "Package At Issue."

<u>Sony shall answer Tessera's Interrogatories 4-9, narrowed as follows:</u>

4.  Identify each Product At Issue.

5.  State the quantity of each Product At Issue made, sold, transferred or used internally by Sony, by quarter, from October 15, 1997 through September 24, 2010.

6.  Separately for each Product At Issue, identify each Package At Issue that the product contains, and the quantity of each such package contained within each such product.

7.  Separately for each Package At Issue, state the manufacturer of the package.

8.  Separately for each Package At Issue, state the number of Billable Pins contained in the package.

9.  Separately for each Package At Issue, describe with specificity: whether the chip(s) within the package are in a face up or face down orientation; the location and pitch of the terminals relative to the IC(s) in the package; and whether the package substrate is reinforced, and if so, its thickness.

During the meet and confer held on October 3, 2012, Sony agreed with the foregoing structure, but insisted upon the addition of two fundamentally improper additions. First, Sony demanded that the time period be limited to January 1, 2006 to June 30, 2010 – only a fraction of the period actually at issue in this case. Tessera explained that its Complaint seeks unpaid

---

[3] These are the dates between which the parties' license agreement was in force, and during which the royalties at issue accrued.

2706406 - 3 - DISCOVERY DISPUTE JOINT REPORT #4 SUPPLEMENT
CASE NO. 5:11-CV-04399-EJD (HRL)

1 royalties over the full duration of the parties' license agreement, and even read ¶ 19 of the
2 Complaint to Sony's counsel. That paragraph states that "Sony has not paid *all of the royalties*
3 owed under the contract" and "did not pay *all royalties* due under the contract when they were
4 originally due." Tessera similarly explained that the Prayer For Relief in the Complaint seeks
5 "Tessera's damages" without any limitation as to timeframe. Indeed, at no point does the
6 Complaint even arguably restrict the damages sought to just those that accrued from 2006-2010.

7 During the meet and confer Sony had no response to any of that language, other than to ask
8 whether the statute of limitations might restrict Tessera's recovery. As Tessera explained to Sony,
9 the statute of limitations does not restrict Tessera's recovery because (1) Tessera relied on Sony to
10 provide accurate reports and payments, only to later learn that Sony had not done so,[4] and (2)
11 Sony waived any such defense in ¶ IX.B of the Master License Agreement, which provides:

12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"[5] Sony declined to respond to either point.
15 Sony's arguments are all the more remarkable because (3) Sony has not even pled the statute of
16 limitations as a defense, and (4) Sony made the same arguments in Joint Report #4, but this Court
17 rejected them. As the Court made clear, "Tessera is entitled to information that would enable it to
18 calculate damages *under its theory of the case*." 10/1/12 Order at 4. Tessera's theory of the case
19 is that, as set forth in its Complaint, it is entitled to the damages that accrued over the duration of
20 the parties' agreement. Sony should not be permitted, by withholding pertinent discovery, to in
21 effect grant itself summary judgment on a defense it has neither pled nor attempted to prove and

22

---

[4] *See, e.g., April Enterprises v. KTTV et al.*, 147 Cal. App. 3d 805, 826 (1983) (holding that cause of action accrues when the plaintiff discovers or should have discovered the injury and its cause).

[5] *See, e.g., Carberry v. Trentham*, 143 Cal. App. 2d 83 (1956) (holding that "no statute of limitation applied" under an agreement that "at any time" during a continuing default by the buyer of real property, the seller "shall be entitled to possession" of the property, finding this provision was "tantamount to and operated as an agreement by the parties to waive the application of the statute of limitations insofar as plaintiff's right to declare a default and recover possession of the property is concerned."); *Atlas Finance Corp. v. Kenny*, 68 Cal. App. 2d 504, 516 (1945) (agreement that the "plaintiff could bring suit at its own convenience and whenever it so desired" was held "tantamount to a waiver of the statute of limitations.").

1  which, when confronted with items (1) and (2) above, it could not even explain.

2      Second, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

3  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ The parties fundamentally dispute what it means for a package to be made

4  ▬▬▬▬▬▬▬ Tessera believes it means what it says – for instance, if a package is manufactured by

5  someone other than Sony, sold to Sony, and then incorporated by Sony into a Sony product that is

6  sold by Sony, that is a package that was made for Sony. The independent third party auditors

7  similarly concluded that packages made ▬▬▬▬▬▬▬ included all third party manufactured

8  packages purchased by Sony and then incorporated into a Sony product. Sony, on the other hand,

9  appears to contend a package can be made ▬▬▬▬▬▬▬ only if Sony engineers and provides the

10 exact design to be manufactured, and then itself contracts with a third party to manufacture the

11 package in accordance with Sony's particular specifications in a predetermined quantity. This is

12 an issue of contract interpretation that will be resolved, if at all, by Judge Davila on summary

13 judgment or by the jury.[6] It is not a basis upon which Sony should be permitted to withhold the

14 core information that Tessera requires to calculate damages under its theory of the case. Once

15 again, during the meet and confer Sony could not explain how the information sought could even

16 conceivably be unnecessary under Tessera's theory of the case; Sony simply reiterated that it

17 intends to argue for a different interpretation of the agreement. Sony's position here, like its

18 position regarding timeframe, ignores the Court's Order that "Tessera is entitled to information

19 that would enable it to calculate damages under its theory of the case." 10/1/12 Order at 4.

20 Tessera reminded Sony of that during the meet and confer, but Sony refused to change its position.

21     Sony's "burden" arguments are misplaced for numerous reasons. First, as explained, the

22 information at issue is not merely relevant but essential to calculating damages, and thus

23 unquestionably discoverable. Second, Sony chose for years to breach an agreement central to its

24 operations, and cannot avoid the consequences simply by complaining that a significant amount of

25 evidence is required to ascertain the full scope of its significant breach. Third, Sony recently

26 announced its intention to file an array of counterclaims against Tessera, including for fraud,

---

[6] Your Honor already ruled, "This Court is in no position to determine the meaning of provisions in the Agreement." 10/1/12 Order at 4.

1  violation of § 17200, and civil conspiracy, the resolution of which will similarly require
2  production of the information sought here.  Fourth, Tessera offered to accept a materially smaller
3  production of technical information, concerning just a handful of neutrally-selected "highest
4  volume" or "top revenue" products in each product category at issue, if Sony would agree to treat
5  such products as representative of the other products in those categories.  Sony declined, without
6  explanation.  Against this background, Sony's complaints about "burden" ring particularly hollow.

7        The Court should be aware of what Sony has done in response to the Court's rejection of
8  Sony's original proposal, and in consideration of the Court's guidance about how the parties should
9  attempt to resolve this dispute: *absolutely nothing*.  Sony's proposal inexplicably remains identical
10 to its already-rejected proposal from the earlier Joint Report.  Sony has simply turned a blind eye
11 to the Court's Order, maintaining a discovery blockade that during the parties' discussions it would
12 not even attempt to reconcile with this Court's rulings.

13 **Sony's Position**

14       Despite the Court's Order that the parties make "diligent efforts" to agree on a reasonable
15 scope of discovery, Tessera persists in demanding that Sony collect and produce documents
16 concerning a wide range of products that could not possibly have any bearing on any issue in this
17 litigation.  While Tessera has finally agreed to limit discovery to Sony products that include IC
18 packages that possess the specific structural characteristics defined in the Agreement, Tessera now
19 expands its demands in two other very significant respects:  (1) seeking documents going back
20 *fifteen years*, instead of documents concerning the audit period, which was Tessera's proposal in
21 Discovery Dispute Joint Report #4 ("DDJR #4"); and (2) potentially seeking documents about
22 every chip in every Sony product for that entire fifteen year period, rather than documents about
23 chips that were "made by or for Sony," which is the subset of chips that are royalty bearing under
24 the Agreement.

25       *Technical Characteristics:*  Tessera has now dropped its grossly overbroad demand for
26 documents concerning "every BGA or LGA product," and has now agreed to limit the technical
27 scope of the production to chips that fall with the narrow definition in the Second Addendum to
28

the Agreement, i.e., that would be royalty bearing. Sony agrees that this is the proper technical scope.

*Temporal Limitation:* In DDJR #4, Tessera's most reasonable proposal was to limit the production of documents to those concerning products sold within the period of the audit. Tessera agreed to this because, as it argued in DDJR #4, this case is about the Connor Group audit: "Tessera's complaint alleges that Sony breached the Agreement by, among other things, (1) failing to pay royalties found owing *by the auditors*, (2) failing to pay additional royalties that *the auditors could not calculate* because Sony provided no information, and (3) failing to cooperate with *the auditors* by refusing to provide the auditors with relevant information." (Dkt #69, at 3 (emphasis added).)

Tessera has now reversed the position it took in DDJR #4 and instead seeks to dramatically increase the scope of the production by extending it *backwards nine years* before the audit period. In addition to being extremely burdensome (if not impossible), this would be improper because (a) California's statute of limitations would bar recovery for alleged breaches of contact more than four years ago (Sony has made regular payments and submitted audit reports to Tessera throughout the course of the Agreement); (b) Tessera already commissioned Ernst & Young to conduct an audit of Sony for the period prior to the Connor Group audit, which actually resulted in Tessera refunding money to Sony; (c) the answer to Sony's Interrogatory No. 3, asking Tessera to "[e]xplain in full detail Tessera's contention that Sony breached the License Agreement," the answer to Sony's Interrogatory No. 5, asking Tessera to "[e]xplain in full detail Tessera's contention that Sony failed to pay any royalties under the License Agreement," and the answer to Interrogatory No. 6, asking Tessera to "[e]xplain in full detail Tessera's contention that Sony breached the implied covenant of good faith and fair dealing" were all limited exclusively to allegations concerning the audit report; and (d) Tessera's answer to Sony's Interrogatory No. 2, seeking the identity of Sony products for which royalties are allegedly owed, stated only that "specific products for which Sony owes royalties under the License Agreement include those identified in the Final Audit Report issued by the Connor Group, a copy of which Tessera understands Sony possesses and a copy of which Tessera will produce."

There is no basis in law or fact—even in Tessera's own interrogatory answers—for Tessera to now seek information on products sold between 1997 and 2006.

For its part, Sony has offered to provide discovery for the period of the audit, January 1, 2006 through June 30, 2010, which is the period of time for which Sony allegedly underpaid royalties. This is the reasonable and logical approach.

**"Made by or for Sony":** The operative Second Addendum to Master License Agreement provides that "Sony shall pay royalties to Tessera for the Tessera Licensed Products . . . *made by or for Sony*." This includes products that are made by Sony, as well as products that are "made for" Sony. It does not include products that were made by a third-party but, unbeknownst to Sony, include Tessera technology, which is how Tessera now seeks to construe it. This difference is dramatic, as Tessera's proposal apparently would require Sony to analyze 10,000 or more third-party chips.

"Made for" products are those that are made at Sony's request or direction to include the licensed technology. This meaning is evident for any number of reasons.

*First*, the plain language "made for" means that the item in question was specifically made for someone, such as where a cup of coffee might be "made for" someone using a requested type of beans and preferred amounts of milk and sugar, but a can of soda purchased from a vending machine was "made" but was not "made for" the person who happened to buy it.

*Second*, the Agreement separately defines "Third-Party Products," which are ███████████████████████████████████████████████████████████████████ The Agreement further provides that, if Tessera were to believe that a Third Party IC that was incorporated into a Sony end product used Tessera Licensed Product, Tessera could ██████████████████████████████████████████ Tessera's interpretation of "made for" improperly includes "Third Party ICs," which are a separate item in the Agreement.

*Third*, Sony has paid Tessera royalties under the Agreement for ***thirteen years***, submitting quarterly reports that ***never*** included any third-party chips. Tessera ***never*** asserted that Sony

should pay royalties on third-party chips *until Sony declined to renew the Agreement in 2010*. Sony's interpretation is confirmed by more than thirteen years of conduct.

*Fourth*, Ernst & Young conducted an audit of Sony prior to the Connor Group audit and did not find that Sony should pay royalties for third-party chips. That sophisticated, independent auditor concluded that "made for" means what Sony says it means.

*Fifth*, there is a very good reason why the Agreement covers only chips made by or for Sony. The technical definition that determines which products are royalty bearing includes internal details about the chips (such as the height of the "substrate") that would be unknown to Sony in the case of a chip that was made by a third-party according to the third-party's own specifications and then simply purchased by Sony. In fact, because Sony in virtually all cases would have no way to determine whether or not a given third-party chip would meet the technical definition, Tessera's proposal is essentially impossible to implement.

*Sixth*, Tessera's position that it is entitled to information concerning third-party chips is at odds with its complete refusal to provide discovery concerning its licensees, who in many cases may be the third-parties from whom Sony purchased chips. Tessera cannot block Sony's efforts to discover information from Tessera about whether these third parties paid Tessera royalties on third-party chips while at the same time seeking royalties from Sony on those chips.

*Finally*, the correspondence that has now been produced by Connor Group, preparer of the subject audit agreement, shows that they conducted the field work for their audit without asking Sony for information about third-party chips, and that Connor Group added third-party chips to their estimate analysis *only after Tessera asked them to do so*, a few weeks after Sony declined to renew the Agreement. (Notably, Connor Group had asked for, and did receive, information about "made for" chips that Sony commissioned.)

Sony is very mindful of the Court's desire that the parties be able to pursue discovery according to their theories of the case. In this instance, however, Tessera's "theories" are so contrary to fact and law that they cannot support the huge burden that they would place on Sony.

**Tessera's Final and "Most Reasonable" Proposal for Resolution**

Tessera has narrowed its definitions and requests in accordance with the Court's instructions, as set forth verbatim on pages 2-3 above. Tessera would agree to accept production of that narrowed set of information from Sony. For brevity, those proposals are not repeated here.

**Sony's Final and "Most Reasonable" Proposal for Resolution**

Sony would agree to provide information (a) concerning chips meeting the definition provided in Section IV.C of the Second Addendum of the Agreement, (b) for the period of the audit, and (c) for products that are either manufactured by Sony or assembled by third parties to Sony's packaging specifications. In the alternative, as the Connor Group has now produced a document that lists the Sony chips used in its "Royalty Estimate Analysis," Sony would agree to produce the technical documents in its possession for those products.

Dated: October 4, 2012                                    IRELL & MANELLA LLP

                                                          By:  /s/ Benjamin W. Hattenbach
                                                              Benjamin W. Hattenbach
                                                              *Attorneys for Plaintiff Tessera, Inc.*

Dated: October 4, 2012                                    FOLEY & LARDNER LLP

                                                          By:  /s/ Aaron W. Moore
                                                              Aaron W. Moore
                                                              *Attorneys for Defendant Sony Corp.*

**Attestation Of Concurrence In Filing**

Pursuant to Civil L.R. 5-1(i)(3), I, Benjamin W. Hattenbach, hereby attest that concurrence in the filing of this Discovery Dispute Joint Report #4 Supplement has been obtained from Aaron W. Moore, counsel for Sony.

Dated: October 4, 2012                                    IRELL & MANELLA LLP

                                                          By:  /s/ Benjamin W. Hattenbach
                                                              Benjamin W. Hattenbach
                                                              *Attorneys for Plaintiff Tessera, Inc.*